(No. 2534— )

SCHNEPP AND BARNES, A CORPORATION, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed May 9, 1939.*
*Rehearing denied May 22, 1939.*

BROWN, HAY & STEPHENS, for claimant.

JOHN E. CASSIDY, Attorney General; GLENN A. TREVOR, Assistant Attorney General, for respondent.

MR. JUSTICE YANTIS delivered the opinion of the court:

Claimant herein is a printing company incorporated under the laws of the State of Illinois, and has been engaged for a number of years in the business of printing and binding in the City of Springfield. During its operation it has from

time to time done a large amount of printing for the State of Illinois. Shortly prior to November 10, 1931 competitive bids were called for by the State of Illinois through its Department of Purchases and Construction for furnishing and supplying what was known as sixth class printing. This call and the specifications and instructions issued thereon was to cover such printing over a period of six, twelve or eighteen months from January 1, 1932.

Claimant inserted in the proposal form submitted to it with such specifications, its itemized bid, stating therein that such proposal and bid were made, "in accordance with the advertisement, instructions and specifications furnished * * * which are hereby made a part of such proposal." The blank form supplied by the State as a proposal sheet to be used by the bidder contained three columns in which the bidder might indicate the price at which he would do the work; same appearing as follows:

| For six months contract | | For twelve months contract | | For eighteen months contract | |
|---|---|---|---|---|---|
| Price | Amt. of bid | Price | Amt. of bid | Price | Amt. of bid |
| $ | $ | $ | $ | $ | $ |

Claimant listed its offer in the first column and left all of the remaining columns blank. Thereafter, on November 25, 1931, after competitive bidding, the claimant entered into contract with the State of Illinois, signed by the president and secretary of claimant company and by the then Director of the Department of Purchases and Construction, by the then Superintendent of Printing and by Louis L. Emmerson, then Governor of the State of Illinois. That contract recited in part, as follows:

"THAT WHEREAS, the Director of the Department of Purchases and Construction * * * in pursuance of the statute * * * has heretofore advertised for proposals for furnishing and supplying Sixth Class printing to be furnished and supplied in full conformity, and in strict accordance with the specifications, instructions and proposal of the party of the first part, for

the term beginning with the 1st day of January, 1932 and ending with the 30th day of June, 1933." * * *

"The party of the second part agrees to pay to the party of the first part therefor in the manner provided by law, at the rates and prices set forth and mentioned in the proposal hereto attached."

In the claim now under consideration claimant seeks an award in the sum of $85,091.64, claiming payment due for unpaid work alleged to have been performed under the terms of and pursuant to said contract in the amount of $66,521.19 and interest thereon at five (5) per cent from September 30, 1933 to April 30, 1939, because of alleged unnecessary and vexatious delay in payment, to the amount of $18,570.45. Incidentally involved is a supplemental agreement entered into between claimant and E. B. Dunigan, then Superintendent of the Division of Printing, in March, 1933, whereby claimant agreed to make the price per volume set of automobile lists, $1,227.50, instead of such charge being computed on the itemized figures quoted in the original specifications and proposal, which the record shows resulted in a cost of $1,700.00 per volume set.

The first orders apparently issued by respondent to the claimant for printing work after the making of the contract of November 25, 1931 was on November 14, 1932. Successive orders for printing of opinions and orders of various boards, miscellaneous blanks and pamphlets, bulletins, circulars, notices and automobile license list books, followed through November and December, 1932, and January, February, March, May and June of 1933.

All of the printing and binding was furnished pursuant to orders issued by whoever was the active Superintendent of the Division of Printing of the Department of Purchases and Construction of the State of Illinois at the respective times, and according to the record such printing and binding was done by claimant and the supplies in question were delivered by it to the various agencies of respondent as indicated in the orders. Bills were submitted prior to September 30, 1933 but payment has in fact not been made.

Notwithstanding the non-payment of previous bills, Schnepp & Barnes continued to print the volumes of motor lists after June 30, 1933, and received ten orders for same. Eight of these aggregated the sum of $12,001.37. The State also refused to pay for these items and a mandamus proceed-

ing was brought in the Circuit Court of Sangamon County on July 19, 1934 to compel payment of the latter sum. After a contested hearing the Circuit Court awarded the Writ of Mandamus and on October 2, 1935 the said sum of $12,001.37 was paid.

After the foregoing mandamus proceedings were brought, claimant company printed two further sets of volumes of motor lists at a price of $3,726.20 and that bill was paid by the State of Illinois on September 13, 1934.

The complaint in the present suit was filed in the Court of Claims on November 1, 1934. Its purpose is to recover the amounts alleged to be due and unpaid up to June 30, 1933. The claim covers one hundred twelve (112) different items aggregating $71,369.77, of which forty-five (45) are for printing the motor list books, in an aggregate of $45,237.50. The balance of the claim covers miscellaneous items as above suggested.

Thirty of the one hundred twelve (112) items involved, aggregate $20,278.99 and were ordered by H. L. Williamson, then Superintendent of the Division of Printing. It appears that all of such items were delivered after the change of administration in *January*, 1933. Eight (8) of the remaining items were ordered by T. E. Bland, Assistant Superintendent, subsequent to January 18, 1933 and aggregated $2,007.85. Fifty-three (53) items were orders issued by E. B. Dunigan, then Superintendent of. Printing, and aggregated $25,995.12, and twenty-one (21) items were ordered by E. T. Rank, Superintendent of Printing and aggregated $23,087.81.

Under the existing practice, stock paper was furnished by the State to the printer for certain types of work, and in recasting the credits in connection therewith, the claimant has conceded an allowance to be due respondent upon claimant's bill by reason of such paper credit, in the sum of $4,848.58, leaving the net balance of plaintiff's claim $66,521.19, plus its additional claim for interest figured to April 30, 1939 of $18,570.45. A number of contentions are made by the Attorney General in opposition to the allowance of any award herein. The first of such objections is that the complaint herein is not verified as provided by rule of court. Examination of the complaint discloses that such complaint is supported by proper bill of particulars and sworn verification, signed October 31, 1934 prior to the filing of the complaint. It is next

contended that many items appearing in the bill of particulars do not come within the proper designation of sixth class printing as described by statutes of Illinois then and there in force.

A recapitulation of such classification is as follows:

"Second and Third Class:

"(a) The printing of the journals, including the daily journals of the Senate and House of Representatives and

"(b) Other printing for the General Assembly such as synopsis of bills, reports of Committees, and communications not comprehended within the first class;

"(c) Also the printing of the Session Laws and Reports of all officers, boards, commissions, institutions and departments, which are bound in cloth or leather, or partly in cloth or leather and partly in paper; shall constitute second and third class.

"Sixth Class:

"(a) All pamphlet work including circulars, synopsis and other similar work and

"(b) All reports and documents which are not bound wholly or in part in cloth, leather or other hard binding, including binding thereof, and not comprehended in any other class, shall constitute sixth class.

"Seventh Class:

"(a) All job printing and

"(b) All printing not otherwise classified including binding thereof, if ordered by the Superintendent of Printing, shall constitute seventh class."

"1931 Cah. Ill. Rev. Stat. Chap. 127, Par. 14."

The evidence herein discloses that the classification of types of printing was made in the Division of Printing at the time it sent out its respective orders.

John J. Donoghue testified that he is Acting Superintendent of Printing for respondent and has been connected with the printing department since March 17, 1933; that he is familiar with the various classes of printing and of the contracts made by his department during the time in question herein; further, that during the year 1932 the claimant did not have the contract for classes two and three, class seven or for the contract for binding; that the records in his office show that the Journal Printing Company had the contract for second and third class work, the Illinois Printing Company had the seventh class work and the Jefferson Company had the contract for binding. Mr. Donoghue testified that under the practice in the department, the classification of

work, i. e. the determination as to the printer to whom various orders should be sent, was made by Mr. Dunigan, Mr. Rank, and himself, during their respective administrations. He further testified that when an order is issued for printing, his department makes an examination to see whether or not sufficient funds remain in the appropriation for that particular expenditure to cover the printing involved in that order. The witness stated that he did not know whether that practice was followed prior to the time he became associated in the office in 1933. Upon examining the various exhibits or order blanks, upon which the several items constituting the present claim rest, Mr. Donoghue identified a considerable number as not being sixth class work but of such character as would be classified under second, third or seventh class. If all of these items should be excepted from favorable consideration herein, as counsel for respondent contends they should be, a deduction from the claim of $6,313.22 would result.

Nothing appears upon some of these exhibits by which one can be definitely informed as to what class the order should be placed in, other than the description itself of the work required thereunder. There are a number of these orders however which bear upon their face in bold type the identification of such matter as being in second, third or seventh class, or in several instances requiring cloth or leather binding which would definitely fix same as printing of the second and third class.

Under the provisions of Illinois law (Paragraphs 10, 14, 15 and 18, Chapter 127, Cahill's Ill. Revised Statutes, 1931), it was obligatory upon the Superintendent of Printing to advertise for bids for the various types of printing work required by the State and to thereafter let separate contracts for each class. Claimant had a contract for sixth class printing. It did not have a contract for any other class, as appears in the record. No authority existed for placing orders with claimant for any printing work except that for which a contract had been awarded to it. The orders for such work other than that of the sixth class could just have validly been given to some outside printer who had never made a bid and who had never received any contract.

The claimant herein was accustomed to doing public printing for the State, and, we cannot but assume, was fami-

liar with the type of work included in its bid of sixth class matter. It was directly advised by the class notations on certain of the orders that the latter were not items for which it held a contract. These specifically are:

| Exhibit | Amount |
| --- | --- |
| A- 4 | $3,469.91 |
| A-10 | 497.28 |
| A-11—(apparent additional cost of binding) | 200.00 |
| A-20 | 6.20 |
| A-29 | 67.66 |
| A-37 | 14.46 |
| A-38 | 28.08 |
| A-43 | 31.50 |
| A-46 | 13.23 |
| A-47 | 8.58 |
| A-48 | 7.45 |
| A-49 | 43.13 |
| A-50 | 21.93 |
| A-52 | 6.00 |
| A-55· | 6.20 |
| A-57 | 42.74 |
| A-58 | 5.60 |
| A-67 | 9.53 |
| A-68 | 9.53 |
| The total of the foregoing is | $4,489.01 |

Counsel for claimant contend that where a governmental authority has the power to make a contract, although its officials may not strictly comply with each statutory requirement in the execution and performance of the same, yet where the State receives the thing of value and appropriates it to its use, it must be regarded as having ratified the contract and should be required to pay therefor, on the theory that the government cannot enjoy the fruits of the contract and at the same time refuse to pay therefor. In support of this contention claimant cites, *People ex rel Chatterton* vs. *Secretary of State*, 58 Ill. 90; *McGovern* vs. *City of Chicago*, 281 Ill. 264; *City of East St. Louis* vs. *East St. Louis Gas Co.*, 98 Ill. 415; and *Smyth Co.* vs. *Chicago*, 294 Ill. 136.

Acceptance of the above rule would result in nullifying every requirement for public letting of State contracts, as a prompt performance of work could be done under such practice, and the State would then be obligated to pay for what

its departmental official had irregularly and illegally obligated it to do.

The object of the statutory provision is to prevent favoritism, corruption and extravagance in the awarding of public contracts, and we consider it the duty of the court to so administer and construe the law as to fairly and reasonably accomplish such purpose, and not to encourage a disregard of such restrictions.

For this court to give validity to bills thus incurred would be to circumvent the spirit, wording and purpose of the legislative act which requires that solicitation of bids shall be required in alloting the printing contracts of the State.

In *Chatterton* vs. *Secretary of State, supra,* the court found that the contract in question had not been obtained by fraud and collusion as alleged in the petition for mandamus; that the secretary had advertised for bids as required by statute and that the merchandise was equal in quality to the sample furnished with proposal for bid, and that the contract was in accordance with its terms. The court there said:

"Petitioner having furnished a thousand reams of the paper *under the contract, in conformity to its terms,* and there being no fraud, he is entitled to receive pay for that quantity."

After thus upholding the contract as having been validly made, the court glided to the opposite conclusion, in recognizing the right of the legislature to rescind the contract as to the balance of the contract for furnishing the remaining one thousand (1,000) reams of paper. In concluding its views the court said:

"It (the contract) was, perhaps, not absolutely void, as it was not made with a fraudulent intent."

We cannot accept this decision as justifying an award for the items of printing for which no contract was held by plaintiff.

In this and in other cases cited by claimant, the parties seeking payment for goods or services, did so under contracts held by them, but which, it was contended, had been improperly made. In the instant case claimant had no contract for printing second, third or seventh class matter or for binding books in leather or card-board, and the statutes expressly require that all printing must be done under contract and upon bids submitted.

The question of allowing recovery on the ground that the State is estopped to deny liability when it has accepted the benefit of the work, was considered at some length in the case of *Green & Sons Co.* vs. *State,* 9 C. C. R. 218, and we quote therefrom:

"Much confusion has arisen in decided cases on account of the failure to distinguish between two general classes of cases, to-wit: 1) Those involving contracts which although irregular, are within the authority of the political subdivision to make and do not violate any mandatory provisions of law; and 2) Those involving contracts which are either in excess of certain limited powers of such political subdivision, or are against public policy or are in violation of mandatory provisions of law.

"The legal effect of a contract made in violation of mandatory provisions of law, is set forth in an annotation appearing in 84 A. L. R., page 954, as follows:

'By the weight of authority, where by statute, charter, or constitutional provision, the power of a municipality, or other political subdivision, to make a contract, is limited, particularly where it is limited to a certain mode or manner of contracting, and any other manner of entering into a contract, or obligation is expressly or impliedly forbidden, no implied liability arises against a municipality for benefits received under a contract entered into in violation of those mandatory provisions, for no liability can result as a matter of implication where the express provisions of the statute or constitution negative its existence.'

"The legal effect of a requirement that public notice of the letting be given, and that the contract be let to the lowest bidder is set forth in 19 R. C. L. p. 1068, Section 356, as follows:

'A statutory provision that all contracts of a municipal corporation above a certain amount shall be advertised in a designated manner and awarded to the lowest bidder is mandatory, and a contract of the designated amount cannot lawfully be made by a municipal corporation in any other way. If the municipal authorities disregard the statute and fail to publish the advertisement as required by law, or award the contract to other than the lowest bidder, a taxpayer of the municipality may have their action enjoined, and the contract although duly executed and signed, cannot be enforced by the other party thereto. Nor can recovery be had on a *quantum meruit.*'

"The question under consideration has arisen in practically every State in the Union, and the decisions of the different States, and in many cases the decisions of the different courts of the same state are not entirely in harmony. The authorities on the question are reviewed in an exhaustive annotation to the case of *Johnson County Savings Bank, et al.* vs. *City of Creston, 212 Iowa 929* reported in 84 A. L. A. 926, in which case the facts were quite similar to the present case.

"In that case suit was commenced by a paving contractor and its assignee against the City of Creston to recover the contract price for repairing certain pavements. Code provisions required that all contracts for street improvements be let to the lowest bidder after publication as set forth in

the Code. No publication was made and it was contended that the contract was illegal. Plaintiffs then amended by adding another count in which they sought to recover the equivalent of the contract price as the reasonable value of the labor and material furnished. In that case the court said:

'The statute is peremptory that, 'All contracts for the construction or repair of street improvements and for sewers shall be let in the name of the city to the lowest bidder by sealed proposals upon giving' prescribed notice. The statute is a prohibition upon letting such contracts in any other mode. * * The city undertook to have the repairs in question made by contract. Having undertaken to have them made by contract, it was required to let the contract on competitive bidding. * * * It is a general principle that a municipal contract entered into in violation of a mandatory statute, or a contract in opposition to public policy, is not merely voidable but void * * * and that no contract for services rendered or goods furnished pursuant thereto can be implied, nor may the acceptance of benefits thereunder be made the basis of a liability by estoppel. * * * A municipal contract let without competitive bidding, when the statute requires competitive bidding, is void, and no recovery may be had either upon the purported express contract or upon an implied contract to pay the reasonable value of the services or material furnished thereunder. * * * Manifestly the making of a contract may not be implied in a case in which an express contract is forbidden. * * *

'To sustain the plaintiff's contention would be to permit one to obtain from a municipality an illegal contract for doing work impossible of return and by performing it enable him to recover the reasonable value of the services and materials furnished—to nullify the law by evasion and indirection and to recover the value of the work done under a contract which the law prohibits.'

"The aforementioned annotation reviews cases from any states, some of which are cited by counsel for claimant. The decisions of our Supreme Court are in accordance with the weight of authority as set forth in such annotation, and inasmuch as our courts have passed upon the question, it will not be necessary' to rely upon the decisions of the courts of other states. Some of the early cases in this State seem to support the contention of the claimant, but some of such cases have been expressly repudiated by the Supreme Court in the case of *DeKam* vs. *City of Streator*, hereinafter referred to; others have been impliedly overruled by such decisions; and still others upon careful analysis are distinguishable upon the facts from the later cases. In any event, if there is now any conflict between the earlier and the later decisions of our Supreme Court, the later decisions are controlling and must be taken to be the law of this State.

"In the case of *Hope* vs. *City of Alton*, 214 Ill. 102, the city had adopted an ordinance creating a legal department, which provided for a corporation counsel, and also provided that the city should not be liable in any case for the services of any attorney except the corporation counsel. Thereafter the council passed a resolution authorizing the employment of a certain attorney other than the corporation counsel, in connection with a number of damage suits then pending. Such attorney rendered legal services in such cases and afterwards commenced suit against the city to recover the value thereof.

In that case the court held that the ordinance had the effect of a law within the corporate limits, that the contract made by the City Council was prohibited by such law and therefore void, and that the city was not estopped from denying its liability thereon by reason of the fact that it had received the benefit of the services rendered. In the course of its opinion the court said:

'Counsel say, however, that plaintiff might recover on the ground that when a city has power to make a contract in one way and exercises the power in a different mode, it will be estopped from setting up the illegal exercise of power when called upon to pay for what it has received under the contract. In other words, the proposition is that when a city gets what it had authority to get in some way, it should pay for what it gets, whether it exercised the power in the prescribed way or not. The obvious answer is, that this contract was prohibited by a valid ordinance, and that the City Council had no right to make it in some other way or by some other method. The City Council had no authority, by any method or process, to agree that the city should pay for legal services to be rendered by the plaintiff, who was neither city attorney nor corporation counsel. The ordinance prohibiting such a contract was in full force and effect, and its operation as a law was in no manner affected by the resolutions. *People* vs. *Latham*, 203 Ill. 9.

'It is further contended that the city is estopped to deny its liability by the acts of the city council and its officers. The doctrine of *ultra vires* is applied with greater strictness to municipal bodies than to private corporations. (1 Smith on Mun. Corp. Sec. 661.) Persons dealing with a municipal corporation are chargeable with notice of its powers to contract, and plaintiff was chargeable with notice of the ordinance in question. A municipal corporation is not estopped from denying the validity of a contract when there was no authority for making it. To hold otherwise would be to expose the taxpayer to all the evils which statutes or ordinances passed for his protection were designed to prevent. Cases where municipal corporations have been held to be estopped when acting in a private capacity in the performance of duties enjoined upon them are not in point in this case, both because the city had performed the duty by providing a law department, with officers to discharge its duties, and also because the contract was directly prohibited by the ordinance.'

"The question here involved was very thoroughly considered by our Supreme Court in the case of *DeKam* vs. *City of Streator*, 316 Ill. 123. The complainants in that case filed their bill against the City of Streator to restrain such city and its officers from paying further money to one G. L. Clausen, pursuant to the terms of certain contracts theretofore made between the city and Clausen whereby he undertook to design a sewer system for the city. No appropriation had previously been made by the City Council for the payment of such work.

"Upon completion of the work Clausen presented to the Board of Local Improvements his bill for his services amounting to $34,263.00, of which he had previously been paid $3,000.00. Thereafter the council ordered payment of the bill. In that case the court held that the contract was void because

it was prohibited by law, and in considering the question there involved, said:

'A contract expressly prohibited by a valid statute is void. This proposition has no exception, for the law cannot at the same time prohibit a contract and enforce it. The prohibition of the legislature cannot be disregarded by the courts. * * *

'In many other cases contracts not prohibited by the express words of a statute but in violation of its terms have been held void, and it is a well established rule that where, from a consideration of all the provisions of the statute, the legislative intention clearly appears to declare an act unlawful no contract for the performance of that act can be enforced, and the rule applies to a contract to do an act contrary to the public policy of the State.' " * * *

We find that there was no authority for the printing work above enumerated in the sum of $4,489.01, and that an award in favor of claimant for such sum is not justified.

A further contention is made by counsel for respondent that because of certain negotiations between the Superintendent of Printing and the claimant in May, 1933, as a result of which claimant reduced the cost of the automobile lists to $1,227.50 per volume set that such action constituted a variance between the proposal submitted and the contract under which such printing was done, and that therefore the entire contract is invalidated. The record shows that a computation of the cost per volume set of such automobile lists under the itemized data contained in claimant's proposal, was approximately $1,750.00. That no change was made in the detailed unit price for printing but that certain changes in the form and wording of the automobile lists was made under the later negotiations between the parties, as a result of which a price of $1,227.50 was arrived at for the books in question.

While we agree with the Attorney General that contracts should not be let upon one basis and thereafter give the successful bidder an advantage over other parties by lessening the burden of the work required, yet in the instant case it does not appear that the claim is based upon any higher charge than that recited in the prices fixed under the original contract, or that the claimant receives any benefit from the change in the form of the automobile lists as put into effect in 1933. If the claimant sees fit to seek payment for its work on a lower basis than his contract calls for, this court does not feel called upon to enforce the higher charge or to invalidate the entire contract therefor. Nothing appears in the

original proposal or specifications as to the exact contents or quantity of printed matter to be found in such automobile lists, and we believe this objection is not good.

We therefore find:

1. That claimant and respondent entered into a valid contract on November 25, 1931, whereby claimant was to furnish certain printed matter of the sixth class to respondent for and during a term of eighteen (18) months, beginning with the first day of January, 1932 and ending with the 30th day of June, 1933.

2. That thereafter claimant did printing, binding and other incidental work for respondent prior to June 30, 1933 covering one hundred twelve (112) different items at an aggregate cost of $71,369.77.

3. That of said total of $71,369.77 the sum of $4,489.01 was invalidly incurred and claimant is not entitled to an award therefor.

4. That there is due as a credit against said total, as conceded by claimant, an allowance because of paper stock furnished by the State, in the sum of $4,848.58.

5. That valid and sufficient appropriations were made for said printing, and that funds remained in said appropriations sufficient to cover the cost of said items from time to time as required; but that the appropriation out of which the claim in question could have been paid lapsed on September 30, 1933.

6. That claimant filed its claim in the Court of Claims November 1, 1934.

7. That the Court of Claims has been open to an adjudication of said matter continuously and from month to month since that time.

8. That the first of claimant's testimony was not taken until January 5, 1939.

9. That while certain civil and criminal litigation is shown to have taken place in the interim, which involved matters pertaining to this claim, it does not appear that claimant was prevented from pursuing its rights in this court at any time. The question of the amount due claimant has been an issue in this case, and the sum due has been one of the items of dispute. Under the conclusions reached by us, a reduction of $9,337.59 has been made in the claim, and interest on the balance is not justified.

Another factor as to the propriety of allowance of any interest on award herein is that subsequent to the time claimant became entitled to this money, the State became indebted to it for the further sum of $12,001.37 for printing performed after June 30, 1933, for the payment of which, after the State declined to pay, claimant brought a mandamus suit and obtained a writ of mandamus, by which the State officials were compelled to pay said sum of $12,001.37. No question is raised in the record as to why the claimant did not include in its mandamus suit the entire debt which it then held against the State of Illinois. If it could succeed, as it did in compelling the State to pay by mandamus, a part of the debt then owing to it, it would appear that it could have secured a right for its entire claim. We therefore find that no sufficient grounds appear for awarding interest to claimant by reason of alleged vexatious delays suffered by it in obtaining the redress here awarded.

As we view the record, that portion of plaintiff's claim for the sum of $62,032.18 comes within the rule heretofore announced in other cases, as being for work validly contracted and unpaid for, and for which payment should therefore be made.

"Where the facts are undisputed that the State has received supplies as ordered by it, and that such supplies were legally bought by the State, and that funds remained in the appropriation therefor at such time, and that claimant submitted bills therefor within a reasonable time, and due to no neglect or fault on the part of claimant, same were not approved and vouchered for payment before the appropriation from which the payment could have been made had lapsed, an award for the amount due will be made."

*Rock Island Sand & Gravel Co.* vs. *State* 8 C. C. R. 165.

An award is therefore made in favor of claimant for the sum of $62,032.18.